# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

SHANNON PATTERSON,

Plaintiff,

v.

Case No. 16-CV-942-JPS

RANDALL HEPP, CHARLES LARSON,
RICHARD STELIGA, ROBERT FRANK,
HOLLY MEIER, JOHN MAGGIONCALDA,
PAULA STELSEL, and JOHN and JANE
DOES 1–10,

Defendants.

**ORDER**

---

Plaintiff Shannon Patterson ("Patterson"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, prison officials at Fox Lake Correctional Institution ("FLCI"), arising from Patterson's slip and fall on a loose floor tile in the prison and his ensuing medical care. Patterson makes constitutional and state-law claims related to Defendants' alleged misconduct. Defendants filed a motion for summary judgment as to all of Patterson's claims on May 3, 2017. (Docket #54). The motion is fully briefed and, for the reasons stated below, it will be granted.[1]

---

[1] Nearly a month after the briefing period closed on Defendants' motion, *see* Civ. L. R. 56(b), Patterson filed a third motion for appointment of counsel and what appears to be a sur-reply in opposition to Defendants' motion. (Docket #81, #83). First, the sur-reply will be stricken from the record, pursuant to Defendants' request, as sur-replies are not permitted as a matter of course (and are indeed disfavored) and Patterson offers no reason why one is necessary in this case. *See Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 631 n.2 (7th Cir. 2010) (observing that granting leave to file a sur-reply is within the district court's discretion); *Groshek v. Time Warner Cable, Inc.*, Case No. 15–C–157, 2016 WL 4203506, at *4 (E.D. Wis. Aug. 9, 2016) (noting that sur-replies are permitted "only rarely; the local rules provide for a motion, a response and a reply, and in the vast

1. **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence

---

majority of cases, this is sufficient"); *C&F Packing Co., Inc. v. IBP, Inc.*, 916 F. Supp. 735, 741 (N.D. Ill. 1995) (rejecting a sur-reply as the non-movant's "attempt to get in the 'last word'" on the motion).

The Court will also deny Patterson's request for appointment of counsel. Patterson has requested the appointment of counsel twice before, and each time he failed to present evidence supporting the request. *See* (Docket #45, #52). He then responded to Defendants' motion for summary judgment without the aid of counsel. An eleventh-hour suggestion that counsel would have crafted a better response will not be tolerated as a method to avoid summary disposition of his claims. This is especially true here, where Patterson presents no new evidence supporting his belief that he is actually unable to litigate his claims on his own. Instead, he offers mere uncorroborated suggestions that Defendants have employed tactics "to obstruct this litigation," have failed to respond to discovery requests, or have lied in their declarations. *See* (Docket #81 at 1–2).

demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

**2. RELEVANT FACTS**

Patterson is an inmate at FLCI. He claims that on January 25, 2015, he slipped on a loose, raised piece of a floor tile just outside his cell. He purportedly injured his neck, leg, and back in the fall and aggravated several preexisting conditions stemming from a car accident he was in prior to his incarceration. He brought this suit against FLCI's warden, Randall Hepp ("Hepp") and the prison Building and Grounds Superintendent, John Maggioncalda ("Maggioncalda"). Also joined as defendants are Dr. Charles Larson ("Larson"), a physician working in the FLCI Health Services Unit ("HSU"), Robert Frank ("Frank"), an HSU nurse practitioner, Holly Meier ("Meier"), the HSU Health Services Manager, Paula Stelsel ("Stelsel"), a Dialysis Nursing Supervisor in the HSU and sometime-Health Services Manager, and Dr. Richard Steliga ("Steliga"), another HSU physician.

**2.1 Patterson's Fall**

Prior to Patterson filing the instant suit, Hepp and Maggioncalda were aware of numerous locations around FLCI where floor tiles were loose or missing. This circumstance had been occurring since before Hepp assumed his position as warden in early 2014, and he knew about it since his appointment. However, Maggioncalda had never witnessed an instance where a floor tile was "sticking up," as Patterson has alleged. In his experience, the floor tiles are likely to crack if they are bent, rather than stick upward from the floor. If staff found a loose floor tile, it would be removed,

leaving the smooth concrete subfloor exposed.[2] The concrete floor provided similar traction to the floor tiles and the height difference between the two was at most one eighth of an inch. In everyday life, walkers must often negotiate walking surfaces with greater height disparities. Defendants note that large-scale replacement of the floor tiles would require a significant outlay, and neither could unilaterally approve such a project.

Although they knew about instances of missing or loose floor tiles, Hepp and Maggioncalda aver that no inmates or institution staff ever notified them of a dangerous condition created by the floor tiles. Patterson accuses Defendants of lying about this, *see* (Docket #79 ¶ 18–19), but he proffers insufficient evidence to support such a conclusion. Prior to his fall, Patterson never himself complained to either Hepp or Maggioncalda that loose floor tiles outside his own cell created a safety concern. Further, although Patterson fell in January 2015, he cites his and another inmates' complaints about the floor tiles from years later, claiming these put Defendants on notice of the problem. These complaints would, of course, have no relevance to Defendants' knowledge at the time of Patterson's

---

[2]Throughout his submissions on summary judgment, Patterson tries to raise disputes of fact as to whether Defendants' practice of removing floor tiles in this fashion exposed inmates to harmful asbestos. *See, e.g.,* (Docket #79 ¶ 12); (Docket #67 at 3). Patterson never raised such a claim in his complaint, he was not permitted to proceed on the claim, and he made no attempt to allege the claim prior to his summary judgment briefing. *See* (Docket #1, #9). The Court will not entertain his eleventh-hour attempt to redefine the scope of this litigation. *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Nor would such a claim have any merit, as Patterson proffers nothing beyond his own lay opinion that he was exposed to asbestos and that such exposure harmed him. Accordingly, all disputes and argument relating to asbestos exposure will be disregarded.

injury. At most, Patterson appears to question Defendants' credibility, but the Court cannot do so at this stage. *Berry*, 618 F.3d at 691.

Additionally, while Patterson says that Hepp knew about the severity of the floor-tile problem because he directed a "study" of it to be conducted, Defendants point out that the study occurred after Patterson's fall, not before. (Docket #78 at 68–69). Indeed, the "study" was conducted only after Patterson filed an inmate grievance relating to his fall. *See* (Docket #69-1 at 10). Likewise, Patterson relies heavily on another grievance he filed after his fall in which the complaint examiner notes in passing that the floor tiles were "causing a safety issue if stepped on." *Id.* at 25.

Finally, Patterson purports to show that Defendants had a special duty to fix the floor tile problem around his cell, both because of his pre-incarceration car accident which left him with numerous chronic injuries, and also because he was housed in a "medical unit." Certainly, it is undeniable that Patterson was injured by the car accident, but he has no evidence showing that Hepp and Maggioncalda knew of this. Further, he cites only the testimony of himself and other inmates who believed that their unit was a "medical" unit for housing injured inmates. *See* (Docket #69, #71, #72, #74). The formal designation and use of a particular prison unit is not something with the inmates' personal knowledge, and the Court therefore cannot consider it. Fed. R. Civ. P. 56(c)(4); *Cooper–Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 429 (7th Cir. 2004).

Patterson notes that a year and a half after his fall, in June 2016, he observed inmates tearing up floor tiles and replacing them with new ones

in the unit where he fell.[3] He further reports that he heard about another inmate at the prison who had fallen on the same floor tiles prior to their repair. This inmate had not filed a grievance about the fall.

## 2.2    Patterson's Medical Care

The remainder of the relevant facts concern Patterson's post-injury care. This Part is lengthy because his allegations of medical mistreatment span more than two years.

After he fell on January 25, 2015, Patterson was seen by an HSU nurse, who instructed that Patterson be taken to Waupun Memorial Hospital for a medical evaluation. Patterson noted a history of orthopedic surgeries, including rods in his left tibia and fibula, and he had a history of chronic leg pain. On examination, medical personnel discovered pre-existing, non-healing fractures in his lower left leg, with no new definitive fractures noted. He was diagnosed with a contusion/strain to his left leg. He was prescribed ibuprofen and sent back to the prison.[4]

Patterson had a follow-up appointment in the HSU on January 26, 2015 regarding his fall. He reported tingling in his buttock, a stiff back, and

---

[3]Patterson says that he heard from some inmates that the tiles were being replaced because of the lawsuit Patterson had filed. *See* (Docket #78 at 42); (Docket #70). This is inadmissible hearsay which the Court cannot consider in resolving Defendants' motion. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001).

[4]Patterson complains that the doctors did not give him a "thorough examination," (Docket #78 at 5), but he does not explain what additional diagnostics or treatments he believes were appropriate. The Court gathers that Patterson believes they did not give enough attention to his back injury and therefore prescribed him crutches, which he says he could not use because of the back injury, and ibuprofen, which he could not take because it would hinder the regrowth of his broken bones. In any event, the Waupun doctors are not defendants in this case, and their treatment decisions do not matter.

a sore neck. The nurse found that these were acute injuries that would likely fade with time. Patterson was provided ibuprofen and scheduled for another follow-up visit on January 27. Patterson, unhappy with the delay, had his mother call Meier to complain.

At his January 27 appointment, Meier discovered bruising and swelling on Patterson's left shin. He was ordered to continue with ibuprofen and use rest and ice. The nurse then referred Patterson to an HSU physician for further evaluation. Patterson claims that Meier did not do a sufficiently thorough check-up, arguing that she failed to see whether his pre-existing conditions from the car accident were aggravated by the fall.

Dr. Larson saw Patterson later that day. Larson reviewed the emergency room records from January 25 as part of his examination. Larson claims that during his visit with Patterson, Patterson was evasive, inconsistent in his descriptions of when and how he was injured, and exaggerated his injuries. He was also generally non-compliant during the physical examination. Larson noted that Patterson showed no signs of acute distress or pain other than a reluctance to bear weight on his left leg. In light of the exam results, the available records, Patterson's history of substance abuse, and Larson's perception that Patterson was interested only in obtaining narcotic pain medications, Larson decided to continue Patterson on the existing course of non-narcotic pain treatment. Larson avers that Patterson mocked him throughout the exam, apparently confident that he could file inmate grievances or lawsuits in order to obtain the narcotics he desired.

Patterson disagrees with Larson's allegations, claiming that Larson performed only a cursory exam, laughed at his injuries, ignored his concern about taking ibuprofen given his prior bone fractures, and seemed annoyed

that Patterson's mother had called the institution to complain. Patterson states that he should have been more thoroughly examined and that his pain warranted treatment with narcotics. He claims that he has never had prescription painkiller dependency issues, although he does not dispute that the medical record shows a history of substance abuse more generally. He also accuses Larson of fabricating his findings about Patterson, his history, and his behavior, in order to cover up his failure to provide adequate medical treatment and to avoid a lawsuit brought by Patterson's mother. Surprisingly, however, Patterson does not dispute that (1) he was a poor candidate for opioid pain treatments and (2) his pain was being adequately managed with non-narcotic pain medications and other treatments such as ice, elevation, and physical therapy. *See* (Docket #79 ¶¶ 44–45, 50).[5]

After this appointment, Patterson's mother called the prison again, complaining that her son was not receiving adequate treatment. Meier took the call and informed Patterson's mother that Patterson was receiving medical care from Larson, who indicated that Patterson was exhibiting drug-seeking behavior. Meier told Patterson's mother that if he was unhappy with his care, he could file an inmate grievance.

On February 8 2015, Meier received a health services request from Patterson. He claimed that he was still in pain from his fall, that Larson had refused to treat him, and that he wanted to see a different doctor. In

---

[5]Patterson makes much of his later request to correct his medical record and remove Larson's purported falsehoods and the fact that this request was allegedly ignored. *See* (Docket #78 at 16). Because Patterson cannot avoid summary judgment by questioning Larson's veracity, *Berry*, 618 F.3d at 691, it is even less tenable to raise allegations against unnamed prison officials for ignoring his request to alter his medical record.

response, Meier scheduled Patterson for evaluation by Dr. Steliga on February 20, 2015. After this time, Meier never received another complaint from Patterson or his mother about his medical care. Patterson was seen again in the HSU on February 10, with complaints of pain and seeking something to abate it. What precisely happened at this appointment is not explained by the parties.

Before his appointment with Steliga, Patterson was seen by Dr. Lang, an outside orthopedic surgeon. Lang agreed with Larson's decision not to prescribe Patterson narcotic painkillers, and he did not change Larson's treatment plan. Lang noted that Patterson had a left tibial nonunion requiring a "revision nailing procedure," and suggested that Patterson use a wheelchair until the pain in his left leg subsided.

Patterson was seen by Steliga on February 20, 2015. Patterson again complained of chronic back, neck, and shoulder pain. Steliga, like Larson, noted that Patterson had a tibia fibula fracture, was taking Tylenol and gabapentin for pain, and was a poor candidate for narcotic pain relievers due to his history of substance abuse. Steliga diagnosed Patterson with chronic pain syndrome secondary to multiple fractures. Steliga opines that such a condition is treated with pain management methods including medication, physical therapy, and psychological care. Steliga instructed Patterson to continue taking his medications and scheduled him for a follow-up appointment at the University of Wisconsin Hospitals and Clinics.

Again, Patterson counters all this by accusing Steliga of lying, denying his history of substance abuse, and claiming that all of the doctor's decisions and notations were part of a cover-up for his inadequate medical care. He also claims that physical therapy did not relieve his pain.

On March 12, 2015, Patterson raised for the first time, in a note to the HSU, that gabapentin was causing undesirable side effects and was not alleviating his pain. Steliga saw Patterson again on April 1, and at this appointment Patterson complained of dizziness and confusion. Steliga reviewed Patterson's most recent x-ray, from February 27, 2015, which showed old fractures, a normal cervical spine, and degenerative joint disease. In response to Patterson's complaint about the side effects of gabapentin, Steliga reduced the dosage and also prescribed amitriptyline, a psychotropic anti-depressant. Steliga did not make any other changes to the course of treatment, since Patterson was scheduled to be seen again by Lang a week later, the reduction in the gabapentin dose addressed Patterson's concern about side effects, and the x-ray did not reveal a need for any urgent additional treatment.

Patterson's next appointment was with Lang on April 8, 2015. Lang again noted that Patterson had a tibial nonunion, and recommended a surgical repair of the condition. He completed an order report on April 16, 2015 regarding that surgery. On May 13, Steliga added a prescription for acetaminophen to Patterson's pain treatment after Patterson reported that he fell and hit his head in his cell. On June 13, Patterson wrote to the HSU complaining of neck and back pain, as well as problems with speech, memory, and clarity. He was put on the list to see an HSU doctor.

Patterson saw Steliga one final time on June 24, 2015. Patterson complained during this appointment that he had a piece of glass lodged in his forearm. He did not complain of any other issues or pain. Steliga ordered an x-ray to determine whether there was something in Patterson's arm.

On July 7, 2015, Patterson had a follow-up appointment with Larson to check on his left leg. Larson noted that Patterson declined an examination but did cooperate in an interview. Patterson, unsurprisingly, says that Larson's statements are false. After learning the details of Patterson's care since their last appointment, Larson determined that Patterson's current restrictions—including assignment to a lower bunk, crutches, wheelchair use for long distances, and canteen delivery, among others—were sufficient and should be maintained indefinitely.

Next, on July 24, 2015, nurse Stelsel received two voicemail messages from Patterson's mother regarding Patterson's need for orthopedic surgery. Stelsel instructed Patterson's mother that the HSU was waiting for cardiology to send dictation before the surgery could go forward. Patterson's mother stated that she would call again for an update. On July 28, Stelsel called the orthopedic office regarding scheduling Patterson's surgery. Stelsel left a message requesting that they call back because the calendar for outside medical appointment are set by the medical providers, not by the HSU.

Patterson was admitted to a University of Wisconsin hospital on September 8, 2015 for surgical repair of his tibial nonunion, which Dr. Lang performed. He was discharged on September 10 with instructions on cleaning the wound. He was also instructed to schedule a follow-up appointment.

On September 17, 2015, Stelsel returned a call to Patterson's mother to update her regarding Patterson's pain medication. She informed Patterson's mother that Patterson had a new order for Norco, the brand name for a hydrocodone-acetaminophen painkiller, and that Patterson had been scheduled for a follow-up evaluation. An exam by Dr. Lang on

September 22 revealed that Patterson's knee motion was excellent and that his sutures had been successfully removed. Dr. Lang recommended that Patterson could bear weigh on his left leg while in a walking boot and that the boot could be removed when resting. He further recommended that Patterson should order impact-resistant footwear, that he could return to showering and getting the incision wet, and that he would have a follow-up appointment with x-rays in four weeks.

Based on Dr. Lang's recommendation for impact-resistant footwear, Dr. Larson initially approved an order for the same, but later determined that Patterson would instead be issued a pair of black Velcro shoes. He reasoned that the black Velcro shoes had a much softer sole than the leather boots normally issued to FLCI inmates, and that this was sufficient to accommodate Patterson's needs.

Patterson's first appointment with nurse practitioner Frank occurred on October 7, 2015. Patterson reported that his surgery went well and that his recovery was also going well. He was able to walk in his cell over short distances but used a wheelchair for longer distances. He reported pain with prolonged standing and felt that his pain was exacerbated by a lack of support in his shoes. Frank did not note that Patterson complained of neck or back pain, other than the issue with his shoes, but Patterson has broadly averred that he consistently complained of neck and back pain throughout this period.

Frank's examination revealed a normal range of motion in Patterson's left knee and trace swelling at the ankle. Patterson was scheduled to see Dr. Lang again in about two weeks. At Patterson's request, Frank sent a note to Lang asking that Patterson be fitted with different shoes. Frank also scheduled Patterson for an appointment to have a foreign

body—the aforementioned piece of glass—removed from his forearm. Frank did no more than this at the time, believing that Patterson was in no acute distress and knowing he had a follow-up appointment scheduled in two weeks.

Patterson next saw Dr. Lang on October 20, 2015. Lang noted that Patterson had possible suture abscess, so he gently debrided the area and applied a bandage. Patterson's x-ray showed further consolidation of the bone graft with no complications. Thus, Lang recommended that Patterson continue to bear weight has he could tolerate it and that he could wean himself out of the walking boot into shoes. Lang also recommended that Patterson be allowed to order different shoes with greater shock absorption than the black Velcro shoes ordered by Larson.

On October 22, based on Lang's recommendation, Dr. Larson discontinued the black Velcro shoes and approved an order allowing Patterson to switch between his walking boot and regular shoes as comfort allowed. He also entered an order allowing Patterson to order shoes and over-the-counter arch support inserts from the institution catalog that would better address Patterson's shock-absorption needs. The catalog contains shoes with the sort of shock-absorption characteristics that Lang recommended. Larson also consulted with the Department of Corrections' medical director, who determined that the institution catalog offered appropriate shoes and that there was no need for custom shoes or orthotics.

Patterson then saw Frank on November 10, 2015, to remove the foreign body in his arm. At the appointment, Patterson reported pain, numbness, and weakness in his left arm resulting from the pre-incarceration car accident. He claimed it had not been addressed since his incarceration. Frank reviewed an x-ray from February 2015 and noted a

transverse fracture of the left scapula with nonunion, meaning that Patterson's shoulder blade was fractured long ago and had not grown back together properly. Frank ordered another x-ray and told Patterson to follow up with him after it was completed.

Per Frank's order, an x-ray was taken of Patterson's clavicle. The two had an appointment to review the results on November 18, 2015. The x-ray revealed a left scapular fracture with subsequent nonunion, and Frank's examination that day showed the Patterson had reduced mobility with the left arm. Nevertheless, Patterson expressed that he did not want to undergo a surgery for the nonunion in his scapula, and so Frank deferred ordering such treatment and asked Patterson to follow up with him in 3–4 months.

Patterson was next seen by Dr. Lang on December 8, 2015, for his six-week surgical follow-up. Patterson says that he complained about the FLCI staff's refusal, in his view, to provide any appropriate care for his neck and back pain. According to Patterson, Lang responded that he was assigned only to assess Patterson's leg injuries.

Lang found that Patterson was doing well and that the x-rays indicated good healing of the tibia. Lang recommended that Patterson order higher-quality shoes than those generally available to the prisoners, that soft restraints be used when transporting Patterson, and that Patterson be evaluated for possible treatment of neck and back pain by a physical therapist or a chiropractor in light of his complaints. Based on this recommendation, Larson initially approved Lang's recommendation for ordering Patterson better shoes, but he cancelled that approval on December 11, 2015, after reviewing the prison catalog with nursing staff and identifying several options therein that would meet Lang's

recommendation. As a result, Larson ordered that Patterson select shoes from the catalog and not order them from elsewhere.

The next appointment between Frank and Patterson occurred on March 30, 2016. Patterson reported no significant changes in his condition. By this point, he was undergoing physical therapy for his neck and back pain, pursuant to Lang's recommendation. The medical record shows that Patterson said that physical therapy was helpful, but now he says that it was not alleviating his pain. He also indicated that his ankles were bothering him and that he was still reliant on a wheelchair for long-distance travel and could not stand for prolonged periods. Patterson reported that he had an appointment with the orthopedist to discuss a second surgery on his leg. He was still ambivalent toward the idea of having surgery on his scapula.

Frank's examination revealed that Patterson was not in any apparent distress. He was wearing a personal pair of shoes rather than the institution-issued boots. His lower extremities were not swollen and he demonstrated a nearly full active range of motion in both ankles. From Patterson's reports and Frank's exam, he determined to renew Patterson's prescription for a wheelchair for long-distance travel, an extra pillow, a cane as needed, and a lower bunk restriction. Frank felt it was appropriate to leave to Lang, the orthopedist, any additional care for Patterson's leg and to follow up after that. Patterson complains that Frank should have requested that Lang attend to Patterson's neck and back pain but did not.

On April 1, 2016, Stelsel received another call from Patterson's mother. She reported that her son requested a clarification of Frank's wheelchair order. Patterson complained that he needed the wheelchair while inside his housing unit, not just for long distances, since he could not

stand for long periods of time. Stelsel reviewed the March 30 progress note by Frank and also was aware that housing units in the prison had chairs available for prisoner use if needed. She apparently did not make the requested change in Patterson's plan of care.

Patterson had another visit with Lang on May 17, 2016 to deal with Patterson's new leg-related complaints. Lang recommended a surgical decompression of the anterior compartment of his left leg. On May 22 and May 25, Patterson wrote to the HSU and requested that he be seen by a specialist for his neck and back pain. He does not say what the HSU's response was to these inquiries.

The medical record next shows that on July 5, 2016, Frank ordered that Patterson be allowed to use the Transcutaneous Electrical Nerve Stimulation ("TENS") unit to address his lower back and thoracic back pain. Patterson also claims that at this appointment, Frank ordered an electromyogram ("EMG") study, which evaluates the presence of nerve damage, to assess Patterson's complaints of pain. Patterson contends that Frank cancelled the order after he left the HSU without explanation.

Lang saw Patterson again on July 14, 2016, for the surgical decompression. The procedure was successful, and Lang provided after-care instructions as well as a prescription for Norco. Patterson returned to Lang for a follow-up appointment on July 28. Patterson's surgical incision was sealed and benign, he had good active ankle motion, and his sutures were removed.

He reported that he was stiff and experienced persistent neck and back pain. He asserted that the HSU staff were refusing to provide treatment for his neck and back despite his continuous complaints about it. Lang noted that Patterson claimed that the previous course of physical

therapy did not resolve his pain. Lang referred Patterson to a non-operative spine rehabilitation provider for further evaluation of his neck and back pain, with a follow-up in three months.[6]

Frank saw Patterson next on August 30, 2016 and noted Patterson's second leg surgery. During the appointment, Patterson reported chronic pain in his left leg which was exacerbated by prolonged standing. He also described chronic numbness and pain in and below the left knee, bilateral ankle pain that worsened with prolonged standing, and intermittent scapular pain that radiated into his arms and hands.

Frank examined Patterson and found that he slightly limped. During the interview, Patterson was calm and showed no signs of acute distress. The two discussed Patterson's complaints, the current specialist recommendations as compared with Patterson's request to use his wheelchair whenever he wanted to, and Patterson's need for other assistive devices for long-distance travel.

Frank diagnosed Patterson with chronic, widespread subjective neuropathic/musculoskeletal pain secondary to the pre-incarceration car accident.[7] That accident had, in Frank's view, caused several fractures which had healed (or been repaired, in the case of the tibial nonunion) but

---

[6]Patterson reports that when he arrived back at the institution from this appointment, an HSU nurse (who is not a defendant in this case) obliged his request to update his wheelchair restriction to "as needed" rather than only for long-distance travel. (Docket #78 at 26). Defendants rightly point out that this is inadmissible hearsay, and so the Court cannot consider it. *Logan*, 246 F.3d at 925. Consistent with his approach to everyone else involved in this case, Patterson accuses the nurse of failing to do as she promised and then falsifying her notes to show that he had no complaints of pain. (Docket #78 at 26).

[7]Neuropathic pain results from damage to nerves for various reasons. The range of neuropathy is graded from mild, moderate, to severe.

would not unexpectedly continue to cause some ongoing pain. Frank opines that the community standard of care for chronic pain includes acetaminophen, non-steroidal anti-inflammatories, physical therapy, use of the TENS unit, neuroleptic and anticonvulsant medications, antidepressants, and exercise—all of which Patterson was either using, had used in the past, continued to use currently, or was offered but chose not to use.

Frank renewed Patterson's allowances for a lower bunk restriction, cane, and wheelchair for long distances. He informed Patterson that he needed more input from the prison staff that monitored Patterson on a daily basis to determine whether he should extend Patterson's wheelchair privileges to unlimited use as Patterson requested. At the time of the appointment, Frank was not convinced that this should be done because it would not benefit Patterson's long-term rehabilitation.

Frank also ordered an EMG to assess what Frank perceived to be Patterson's complaints of neuropathic pain. The EMG would, if positive, help focus treatment efforts or, if negative, would help show that Patterson's complaints of pain were illegitimate. Patterson disputes that Frank ordered the EMG, but his dispute appears to be directed at the fact that the July 2016 EMG was ordered and then cancelled, as noted above. Frank recommended that Patterson start taking ibuprofen for pain.

Patterson had another appointment with Frank on October 24, 2016, to review the results of the EMG that had been taken on October 6. Patterson continued to report numbness and pain in his left leg and back, exacerbated by long periods of standing. Patterson claimed that he had a collapsed disc in his spine from the car accident which would require back surgery to fix. Patterson also asserted that he experienced pain and

numbness in his upper extremities. He reported that ibuprofen was helping somewhat but that it upset his stomach.

Frank's examination showed that Patterson demonstrated a slight limp, but he was calm and in no apparent distress. He reviewed the EMG results with Patterson, which showed mild, chronic neuropathy resulting from nerve damage in his legs. The neuropathy was not active, meaning it was not getting any worse over time. Moreover, the EMG showed the neuropathy did not stem from a compression in Patterson's lower back, as he believed. Furthermore, Frank opines that it was strange for Patterson to complain of increased pain after prolonged standing, as the EMG did not show radicular neuropathy.

Treatment for neuropathy mirrors the treatment of chronic pain described above, with a greater emphasis on neuroleptics and antidepressants. Since Patterson had already tried multiple medications that are routinely used for neuropathy, including gabapentin, duloxetine, and amitriptyline, but had stopped them due to their side effects, Frank decided to offer a trial of pregabalin. Patterson declined, contending that related medications had caused unpleasant side effects in the past and had not relieved his pain. He also expressed a desire for treatment other than simply treating his pain through medication.

Frank also ordered a second EMG of Patterson's upper extremities to address the complaints of pain there. Finally, Frank referred Patterson the Department of Corrections Special Needs Committee for his request to use his wheelchair at any time while in the housing unit. The Committee denied Patterson's request.

Patterson was seen by Dr. Lang again on October 18, 2016, for a follow-up on the second leg surgery. Lang recommended that Patterson

could use his left leg with limitations and that he should follow up with the prison medical providers in the future.

Patterson inquired with the HSU on December 11, 2016 about whether an appointment with a back specialist had been scheduled. The next day, the HSU responded that this would be discussed at his upcoming appointment in January 2017. Patterson was seen by a non-defendant HSU nurse on January 9, 2017, who suggested that Patterson should seek help from Frank about his back treatment. This angered Patterson; he viewed it as yet another instance of denying him medical care and shunting his care off to the next person. Defendants respond that the reason Patterson was referred back to Frank was to maintain continuity of care.

Apparently during this appointment, Patterson learned that his spine specialist referral had been cancelled. He wrote the HSU the next day demanding an explanation. An HSU staff member who is not a defendant responded to the request but did not answer Patterson's question.

The upper-extremity EMG was conducted on January 13, 2017. The results were normal, with no evidence of cervical radiculopathy or brachial plexopathy—meaning there was no indication that there existed nerve compression from Patterson's brachial plexus or his neck. Thus, the treatment options for Patterson's complaints of chronic pain remained as they were.[8]

Frank's last appointment with Patterson occurred on February 10, 2017. However, Defendants report that Patterson continues to receive care from HSU staff and from off-site providers as necessary for his continued

---

[8]Again, Patterson offers inadmissible hearsay that the doctor who performed this second EMG opined that Patterson had a pinched nerve that would not show up on an EMG. (Docket #78 at 47); *Logan*, 246 F.3d at 925.

complaints of pain. He is scheduled for an appointment with the University of Wisconsin Spine clinic later this year.

In all, from his fall on January 25, 2015 through February 10, 2017, Patterson was seen approximately fifty-eight times in the HSU. He underwent many diagnostic studies, including x-rays and two EMGs. He was treated with two surgeries by outside medical providers to address leg problems and had numerous follow-up appointments with those providers. His neck, leg, and back pain was addressed with numerous medications over time, as well as physical therapy, the TENS unit, and accommodations like a wheelchair, cane, extra pillow, and lower bunk restriction.

3.     **ANALYSIS**

In this suit, Patterson raises essentially two types of claims. The first, against Hepp and Maggioncalda, relates to Patterson's fall. The second, against the medical Defendants, concerns the care he received after the fall. For each type of claim, Patterson asserts that Defendants' conduct violated both the Constitution and Wisconsin state law. The Court will address each of these claims in turn.[9]

### 3.1     Eighth Amendment Claim Arising From Floor Tiles

The Supreme Court has interpreted the Eighth Amendment as requiring a minimum standard for the treatment of inmates by prison officials: prison conditions must not, among other things, involve "the

---

[9]At various points in his briefing, Patterson also tries to raise a claim that certain unnamed prison officials have harassed him since he filed the instant lawsuit and his professed need for constant use of a wheelchair. *See, e.g.,* (Docket #78 at 34, 50–51). As with the claim related to asbestos, *see supra* note 2, Patterson will not be permitted to proceed on this new claim at such a late stage in this case. *Shanahan*, 82 F.3d at 781.

wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). An inmate's constitutional challenge to the conditions of his confinement has two elements. *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004). First, he must show that the conditions at issue were "sufficiently serious" so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotations omitted).

Even if conditions were sufficiently severe, the prisoner must also demonstrate that prison officials acted with "deliberate indifference" to the conditions. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991); *Whitman*, 368 F.3d at 934. "Deliberate indifference" means that the official knew that the inmate faced a substantial risk of serious harm from the conditions in question, and yet disregarded that risk by failing to take reasonable measures to address it. *Farmer*, 511 U.S. at 847; *Johnson v. Phelan*, 69 F.3d 144, 149 (7th Cir. 1995). It is not enough for the inmate to show that the official acted negligently or that he or she should have known about the risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Haley v. Gross*, 86 F.3d 630, 641 (7th Cir. 1996). Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference. *Pierson*, 391 F.3d at 902.

Patterson fails to establish either element. First, he cites no case, and the Court has located none, finding that loose or damaged floor tiles constitute a prison condition of constitutional magnitude. Prison conditions may be "harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). The Eighth Amendment "does

not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans." *Carroll v. DeTella*, 255 F.3d 470, 472–73 (7th Cir. 2001). Rather, "extreme deprivations are required to make out a conditions-of-confinement claim." *Turner v. Miller*, 301 F.3d 599, 603 (7th Cir. 2002); *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Viewed through this lens, Patterson's complaint about poorly maintained floor tiles cannot be considered a denial of "the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 834. Rather, a slip-and-fall case like Patterson's implicates nothing more than a "'daily risk faced by members of the public at large,'" and as such is not so grave as to raise constitutional concerns. *Coleman v. Sweetin*, 745 F.3d 756, 764 (5th Cir. 2014) (quoting *Reynolds v. Powell*, 370 F.3d 1028, 1031 (10th Cir. 2004)); *Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014).

As to the second element—deliberate indifference—Patterson's evidence also falls short. He was required to come forward with evidence showing that Defendants "acted with the equivalent of criminal recklessness." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). That is, "a plaintiff must establish that the official knew of the risk (or a high probability of the risk) and did nothing." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). At most here, however, Defendants failed to act with due care in attending to the condition and repair of the floor tiles. Such conduct does not implicate the protections of the Constitution. *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold" of constitutional protections); *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985) ("[S]imple inattention or

inadvertence [] may not form the basis for an eighth amendment claim[.]"), *overruled on other grounds*, *Henderson v. Wilcoxen*, 802 F.3d 930 (7th Cir. 2015).

Further, there is little evidence in the record suggesting that Hepp and Maggioncalda in fact knew that there was a substantial safety hazard posed by the floor tiles prior to Patterson's fall. Most of Patterson's evidence post-dates the fall and is therefore irrelevant. Further, the poor condition of the floor tiles themselves was not enough to put Defendants on notice of a significant risk of harm, as Patterson does not contest that most people are confronted by more hazardous walking conditions in everyday life. Indeed, the risk of injury in this case was far less obvious than the risk of injury in a leaking, unsanitary shower without floor mats—as was the situation in Patterson's cited case, *Curry v. Kerik*, 163 F. Supp. 2d 232, 234–35 (S.D.N.Y. 2001)—making Defendants' failure to attend to the floor tiles less culpable. *See also Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985) (safety hazards in prison were actionable because they were exacerbated by faulty lighting through the institution); *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991) (noting that a totality of unsafe conditions can violate the Constitution where each condition might not do so alone, such as overcrowding combined with unsanitary conditions).

Patterson claims that Hepp and Maggioncalda had a special duty to ensure that the area around his cell was safe, both because they knew of his injuries from his prior car accident and because his was a "medical unit" housing injured prisoners. (Docket #67 at 5). As discussed above, he cites no authority establishing that either of these things are true as a matter of fact, or that they heightened Defendants' duty as a matter of law. Thus, Patterson's reliance on cases like *Frost v. Agnos*, 152 F.3d 1124, 1129 (9th Cir. 1998), is misplaced, as there the prison officials did nothing despite

knowing that the plaintiff had fallen several times while walking on crutches on a slippery floor. *See also Coleman*, 745 F.3d at 766 (distinguishing *Frost* on similar grounds).

For these reasons, Patterson's Eighth Amendment claim relating to the floor tiles is without merit and must be dismissed.

### 3.2    State Law Claim Arising From Floor Tiles

Patterson's related state-law negligence claim concerning the floor tiles also cannot proceed, but not because the evidence necessarily establishes a lack of negligence. Instead, Patterson has not proffered facts to overcome Defendants' discretionary immunity provided by Wisconsin statute.

Wisconsin officials are immune from liability for "acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). Wisconsin courts have interpreted this protection as extending to all conduct involving "the exercise of discretion and judgment." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 677 (Wis. 2005) (quotation omitted). There are, however, four categories of acts to which immunity does not apply: "(1) ministerial duties imposed by law, (2) duties to address a known danger, (3) actions involving professional discretion, and (4) actions that are malicious, willful, and intentional." *Scott v. Savers Prop. & Cas. Ins. Co.*, 663 N.W.2d 715, 721 (Wis. 2003). It should be noted that the ministerial exception is not really an exception to immunity at all; instead, it denotes situations in which immunity does not apply in the first place because the act in question was non-discretionary. *See Spencer v. County of Brown*, 573 N.W.2d 222, 224 (Wis. Ct. App. 1997), *abrogated on other grounds*, *Blum v. 1st Auto & Cas. Ins. Co.*, 786 N.W.2d 78, 90 (Wis. 2010). The immunity afforded by Section 893.80(4)

and the exceptions thereto represent "a judicial balance struck between 'the need of public officers to perform their functions freely [and] the right of an aggrieved party to seek redress.'" *C.L. v. Olson*, 422 N.W.2d 614, 617 (Wis. 1988) (quoting *Lister v. Bd. of Regents of Univ. of Wis. Sys.*, 240 N.W.2d 610, 621 (Wis. 1976)).

Here, Patterson seems to resist Defendants' assertion of immunity on the ground that their duty was ministerial, not discretionary, and that they failed to respond to a known danger. The Court will address each argument in turn.

### 3.2.1   Ministerial Versus Discretionary Duties

The ministerial exception removes an official's immunity where the duty in question "is absolute, certain and imperative, involving merely the performance of a specific task when the law imposes, prescribes, and defines the time, mode and occasion for its performance with such certainty that nothing remains for judgment or discretion." *Lister*, 240 N.W.2d at 622. In contrast to ministerial tasks, discretionary acts require a public official to determine how a general policy should be carried out or how a general rule should be applied to a specific set of facts. *Lifer v. Raymond*, 259 N.W.2d 537, 541 (Wis. 1977). Even acts performed pursuant to a legal obligation may be discretionary because there may exist room for judgment. *Scott*, 663 N.W.2d at 722. A key step in inquiring whether an act is discretionary or ministerial is to identify the law creating the duty to act. *Legue*, 849 N.W.2d at 294. "Where there is a written law or policy defining a duty, we naturally look to the language of the writing to evaluate whether the duty and its parameters are expressed so clearly and precisely, so as to eliminate the official's exercise of discretion." *Pries v. McMillon*, 784 N.W.2d 648, 656 (Wis. 2010).

The Court begins, therefore, with the alleged source of Defendants' duty. Patterson cites *Henderson v. Milwaukee County*, 543 N.W.2d 544, 547 (Wis. Ct. App. 1995), for the proposition that Defendants have a duty to maintain a safe prison. (Docket #67 at 8). The duty in *Henderson* was premised on the Wisconsin safe place statute, which sets forth a heightened duty for owners of public buildings to construct, repair, or maintain buildings safely. Wis. Stat. § 101.11; *Mair v. Trollhaugen Ski Resort*, 715 N.W.2d 598, 604 (Wis. 2006).[10] The statute provides, in relevant part:

> Every employer shall furnish employment which shall be safe for the employees therein and shall furnish a place of employment which shall be safe for employees therein and for frequenters thereof and shall furnish and use safety devices and safeguards, and shall adopt and use methods and processes reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters. Every employer and every owner of a place of employment or a public building now or hereafter constructed shall so construct, repair or maintain such place of employment or public building as to render the same safe.

Wis. Stat. § 101.11(1).

As applied to Defendants, the duty imposed by this statute is discretionary, not ministerial. The Wisconsin Court of Appeals so held in *Spencer*, where a prison inmate was injured when he slipped and fell on a terrazzo floor in the shower area. *Spencer*, 573 N.W.2d at 224. The court

---

[10]The prisoner in *Henderson* alleged both a common-law duty and a statutory duty arising from the safe place statute. *Henderson*, 543 N.W.2d at 749. However, the court did not discuss the contours of the prison's common-law duty as distinct from the duty imposed by the safe place statute, and Patterson does not explain whether or what the differences might be. *See* (Docket #67 at 8). Consequently, the Court focuses on the duty announced in the safe place statute.

rejected the inmate's contention that the sheriff had a ministerial duty to make the shower safer, such as by providing railings or skid-proof floors. *Id.* at 226. The court observed that the safe-place statute required the defendant "to use reasonably adequate methods to make the shower area safe, and to do every other thing reasonably necessary to protect the safety of individuals like [the inmate]." *Id.* (emphasis in original). In the court's view, "[t]his language implies the exercise of discretion and judgment by government officials in determining what measures are reasonably necessary to make the shower facilities safe." *Id.* The statute does not supply specificity "as to time, mode and occasion 'with such certainty that nothing remains for judgment or discretion.'" *Id.* (quoting *Stann v. Waukesha County*, 468 N.W.2d 775, 779 (Wis. Ct. App. 1991)); *see also Larsen v. Wis. County Mut. Ins. Co.*, 855 N.W.2d 493, at *3 (Wis. Ct. App. 2014).

So too, here, Defendants' alleged duty to maintain the tile floors was discretionary. Patterson's argument is not appreciably different from that of the inmate in *Spencer*. In both instances, the inmate asserted that certain measures would better protect them from injury. In the case of the prison shower in *Spencer*, the Wisconsin Court of Appeals determined that the sheriff enjoyed discretion in deciding how best to use the resources at his disposal to fashion appropriate safeguards in the shower area. Likewise, the general duty imposed by Section 101.11 left room for Defendants to exercise judgment in deciding what protective measures or repairs concerning the floor tiles were reasonably necessary in light of the resources available to them. Nowhere does the statute purport to define the contours of the safe place duty with specificity. Patterson's belief as to what measures were reasonably necessary to protect him cannot overcome the discretion

afforded to Defendants in making that determination. Thus, Defendants'
duty was discretionary, not ministerial.

### 3.2.2   Known and Compelling Danger

Patterson argues in the alternative that even if Defendants' duty was
discretionary, they were aware of Patterson's special needs and ignored
them. In particular, Patterson claims that Defendants knew of his
preexisting injuries resulting from his car accident and that there was an
increased risk for injury in Patterson's unit because it was a "medical unit"
housing prisoners with injuries. Patterson contends that Defendants
ignored these special risks and therefore are deprived of immunity. *See*
(Docket #67 at 8).

The known-danger exception, similar to the ministerial exception,
applies in instances where "there exists a known present danger of such
force that the time, mode and occasion for performance [are] evident with
such certainty that nothing remains for the exercise of judgment and
discretion." *Lodl v. Progressive N. Ins. Co.*, 646 N.W.2d 314, 324 (Wis. 2002)
(quotation omitted). In other words, the danger must be an "accident
waiting to happen." *Heuser ex rel. Jacobs v. Comm. Ins. Corp.*, 774 N.W.2d 653,
659 (Wis. Ct. App. 2009) (quotation omitted). The circumstances must be
"sufficiently dangerous so as to give rise to a ministerial duty—not merely
a generalized 'duty to act' in some unspecified way, but a duty to perform
the particular act upon which liability is premised." *Lodl*, 646 N.W.2d at 324
(emphasis added). Put differently, the official must have failed to make a
particularized response that was required under the circumstances
presented. *Heuser*, 774 N.W.2d at 660. The choice of remedy is within the
official's discretion and is therefore shielded by immunity under Section

893.80(4). *Id.* Only by doing nothing in response to a known and sufficiently severe danger will the official open himself to liability. *Id.* at 662.

Patterson's claim fails to meet the known danger exception for several reasons. First, while all persons face the danger of a fall from uneven floor tiles, this danger pales in comparison to those obvious and compelling dangers recognized in Wisconsin courts as warranting abrogation of immunity. *See, e.g.*, *Cords v. Anderson*, 259 N.W.2d 672, 680 (Wis. 1977) (park ranger ignored danger presented by hiking trail that passed within inches of a ninety-foot gorge); *Domino v. Walworth County*, 347 N.W.2d 917, 919 (Wis. 1984) (sheriff's dispatcher failed to warn motorists of a fallen tree that blocked a road). Thus, the condition of the floor tiles alone did not give rise to a sufficiently obvious danger.

Second, as noted previously, Patterson has not established as an evidentiary matter that his was a "medical" unit or that Hepp or Maggioncalda knew of his pre-incarceration accident. Further, Patterson did not suffer any falls prior to January 25, 2015, nor did Hepp or Maggioncalda receive complaints from other inmates before that date that the floor tiles were dangerous. As a result, it is difficult to conclude that Patterson's injury, even if potentially foreseeable, was "an accident waiting to happen." *Heuser*, 774 N.W.2d at 659. Indeed, the Court of Appeals in *Spencer* did not find the danger of a fall in the shower to be compelling although the inmate in that case suffered from a noticeable limp and showered without problems for only five days before he fell. *Spencer*, 573 N.W.2d at 227. Patterson's ability to successfully navigate the floor tiles prior to January 2015 belies his claim that there was an immediate, obvious danger in need of a specific response.

As a result, Defendants qualify for immunity under Wis. Stat. § 893.80(4) and Patterson's state-law claim concerning the floor tiles must be dismissed.

### 3.3 Eighth Amendment Claim Concerning Medical Care

Patterson's other two claims arise from his allegation that he received inadequate medical care following his fall. First, he asserts that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. To state such a claim, the plaintiff must show: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

The record does not establish that Defendants were deliberately indifferent to Patterson's condition, assuming *arguendo* that it was sufficiently serious. To prove this, a plaintiff has to come forward with evidence showing more than ordinary or even gross negligence. *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991); *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991). Instead, he must prove that the medical professional's treatment decisions were "such a substantial departure from

accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize[s] the conduct prohibited by the [Eighth Amendment]." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). If the inmate has received some health care, it then falls to him to show that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his serious medical condition. *Snipes*, 95 F.3d at 592. Mere disagreement with a doctor's medical judgment is insufficient. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007); *Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Mere dissatisfaction with a particular course of treatment, or even malpractice, does not amount to deliberate indifference."). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d at 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)). Courts generally defer to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008). A court must "examine the totality of an inmate's medical care when considering whether that care

evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

Patterson's claims against prison medical personnel follow several familiar and unmeritorious themes. First, he expresses dissatisfaction with their treatment decisions, such as denying him narcotic pain medication, failing to adapt quickly enough to the undesirable side effects some of his medications caused, prescribing him shoes from the prison catalog rather than custom-fit orthotics, denying him unlimited wheelchair use, and delaying his referral to a specialist for his purported neck and back pain. These are matters of medical judgment, and Patterson advances no reason why these decisions were "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition. *Snipes*, 95 F.3d at 592. Instead, the record reveals that these were choices selected from among a range of treatment options, informed by medical judgment. As such, the Court is in no position to question them. *Jackson*, 541 F.3d at 697–98.

Patterson offers only his lay opinion that his medical providers should have done more, or that their treatment was "cursory," *see* (Docket #67 at 12), but this does not help his claim. *See Edwards*, 478 F.3d at 831. His treatment providers are not guilty of deliberate indifference for having failed to abide by his desires, *Reynolds*, 84 F. App'x at 674, and he has proffered no facts showing that her diagnosis and treatment were "so inadequate that [they] demonstrated an absence of professional judgment, that is, that no minimally competent professional would have [done the same] under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Further, it matters not that, in cases like the provision of shoes, Dr. Larson did not follow Dr. Lang's recommendation,

as he was entitled to make his own determination of the medically appropriate course of treatment. *See Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) ("[A] difference of opinion among physicians is insufficient to establish deliberate indifference."); *Askew v. Davis*, 613 F. App'x 544, 547 (7th Cir. 2015).

Similarly, even if Larson was dismissive of Patterson's complaints during their first appointment, as Patterson claims, *see* (Docket #67 at 12), Patterson lacks evidence that Larson's resulting treatment decisions were constitutionally inadequate. This is the crucial point Patterson seems to miss throughout. Larson is not required under the Constitution to have a pleasant bedside manner or humor what he perceives as drug-seeking behavior; he is merely obliged to provide prisoners with constitutionally adequate healthcare. Patterson has not shown that Larson, influenced by his dislike for Patterson, provided "easier and less efficacious treatment" without exercising professional judgment. *Estelle*, 429 U.S. at 104 n.10; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). In fact, despite suspicions of malingering and narcotic-seeking, Dr. Larson and nurse practitioner Frank did not simply dismiss him. *Greeno v. Davis*, 414 F.3d 645, 654 (7th Cir. 2005). Rather, they continually assessed Patterson's condition and complaints, offering what treatments were medically warranted and going so far as to evaluate the neuropathic elements of Patterson's ceaseless complaints of pain. *See Thomas v. Wahl*, 590 F. App'x 621, 624 (7th Cir. 2014) (finding no deliberate indifference where physician engaged in a lengthy and conservative course of pain treatments).

Likewise, Patterson argues that HSU officials impermissibly ignored his complaints of pain, but nothing in the record supports such a

conclusion.[11] HSU staff treated Patterson's neck, leg, and back pain with medication, the TENS unit, physical therapy, and other treatments. They evaluated that pain numerous times, including with two EMG studies. Whether they should have referred him to a specialist or provided some additional treatment is, again, a matter of medical judgment. Patterson erroneously assumes that each of his complaints should have received a quality and quantity of care that he prescribed. The Constitution does not mandate the prisoner's choice of treatment. *Reynolds*, 84 F. App'x at 674. The totality of Patterson's course of treatment demonstrates that his complaints were heard and treated over and over again. *Dunigan*, 165 F.3d at 591.[12]

The second theme of Patterson's claim ties into the first. Perhaps recognizing that disagreement with a course of treatment does not establish deliberate indifference, Patterson ups the ante by accusing every Defendant of lying about his complaints, his physical condition, and his treatment needs in order to deny him care. He also posits that Defendants conspired to fabricate or alter, after the fact, documents in his medical record. *See, e.g.*, (Docket #67 at 13–16). Much of Patterson's consternation seems to stem from Dr. Larson's comment in January 2015 that he expected to be sued by

---

[11]It is worth noting that whether Patterson's injuries originated from his car accident or were caused only by the January 25, 2015 fall, which the parties strenuously dispute at several junctures, is immaterial; the record reflects that Patterson's conditions and pain were treated regardless of their origin.

[12]Additionally, to the extent Patterson claims that Meier and Stelsel are liable for other providers' alleged misconduct merely in their role as supervisors in the HSU, this is not a viable theory for a Section 1983 claim. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Moreover, other than receiving a few phone calls from Patterson's mother, it does not appear that either nurse had any involvement in Patterson's care.

Patterson's mother. *Id.* Patterson believes that every action taken afterward was part of a conspiratorial cover-up of Defendants' medical malfeasance, including fabrications and false promises by Larson, Frank, and the nursing staff. *See id.*; (Docket #78 at 28–29, 36–39, 54–55, 61–64).

This position is flawed because of the posture in which the Court finds itself. The Court cannot normally question the veracity of the witnesses or the documents presented when considering a motion for summary judgment. *Berry*, 618 F.3d at 691. Patterson offers no more than his speculation that the witnesses are lying and that the documents are not authentic. This does not carry his burden to show that material issues remain for trial. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *Lindwurm v. Wexford Health Servs., Inc.*, 84 F. App'x 46, 48 (10th Cir. 2003) (finding that the plaintiff failed to raise a triable issue as to whether his medical records were falsified).

Moreover, the real thrust of Patterson's accusations of lying is that he disagrees with his medical providers as to the severity of his injuries and the proper course of treatment. Without belaboring the point, this is not a proper basis for a constitutional claim. Indeed, even assuming that Defendants falsified records or lied to him about promised treatments or tests, Patterson fails to demonstrate that his treatment was constitutionally inadequate, which is the truly important question here. *Rega v. Beard*, Civil Action No. 08–156, 2011 WL 7094571, at *6 (W.D. Pa. Dec. 13, 2011) ("[M]erely lying to a patient does not constitute deliberate indifference."); *Hines v. Smith*, No. 04 Civ. 5903(PAC), 2006 WL 2038454, at *8 (S.D.N.Y. July 17, 2006) (a prisoner must show both that defendant lied to prevent him from receiving care, and also that the care was objectively necessary). In other words, Patterson's claim is not for lying, which is generally not a

Constitutional violation anyway. His claim is for deliberate indifference to his medical needs, and the record indisputably establishes that he was provided appropriate medical care.

Take, for example, Frank's alleged cancellation of the July 2016 EMG. First, Patterson offers only conjecture that Frank cancelled the appointment out of ill will and a desire to deny him medical treatment. (Docket #78 at 30–31). And even assuming he promised to order the EMG and then cancelled the order, this was not deliberate indifference. The record does not reveal that failure to perform the test in April fell below the constitutionally acceptable standard of care. Patterson claims that Frank ordered the EMG only after this lawsuit was filed, in an effort to disprove Patterson's claims of pain. (Docket #67 at 14). Frank admits that he was seeking to either substantiate or disprove Patterson's allegations of pain, but he also avers that this was a medically acceptable thing to do, as it would better define the underlying causes of Patterson's claims of pain. *See* (Docket #55 at 9). Other than Patterson's speculation of animus, there is nothing suggesting that Frank's decision to order or not order the test constituted deliberate indifference. *Gamble*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.").[13]

---

[13]Another example is Frank's alleged promise to update Patterson's wheelchair restriction to unlimited use, which Patterson says Frank failed to follow through on and lied about afterward. (Docket #78 at 35–36). What Patterson lacks is any evidence showing that unlimited wheelchair use was medically indicated or that failure to order the same constituted deliberate indifference to his needs. In fact, Patterson does not dispute that the Special Needs Committee made the final decision about the wheelchair.

The remainder of Patterson's allegations of medical mistreatment coupled with a cover-up conspiracy are similar, and so the Court declines to review each in granular fashion. On the record as a whole, the Court finds that Patterson's medical deliberate indifference claim must be dismissed.

### 3.4 State Law Claim Concerning Medical Care

Patterson's final claim, medical malpractice under Wisconsin state law, is grounded on the same facts discussed in the previous Part. *See supra* Part 3.3. This claim, however, is more easily disposed of, since Wisconsin state law usually requires, as part of a *prima facie* medical malpractice case, that a plaintiff establish the standard of care through expert testimony. *Carney-Hayes v. N.W. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005). Patterson has offered none.

Nor has Plaintiff proffered facts supporting the only alternative to expert testimony on the standard of care: namely, that the standard of care "[is] within the area of common knowledge and lay comprehension." *Olfe v. Gordon*, 286 N.W.2d 573, 576 (Wis. 1980). Nothing in the evidence reflects that the medical matters at issue would be part of the "ordinary experience of mankind," *Cramer v. Theda Clark Mem'l Hosp.*, 172 N.W.2d 427, 429 (Wis. 1969), which normally includes things like "the removal of the wrong body part despite a correct preoperative diagnosis or leaving a surgical instrument in the patient," *Jeckell v. Burnside*, 786 N.W.2d 489, at *2 (Wis. Ct. App. 2010). Instead, it is clear that assessing the propriety of Defendants' actions with respect to Patterson's care would "require special learning, study, or experience." *Cramer*, 172 N.W.2d at 429. As a result, Patterson was required to secure expert testimony to explain these matters to the jury, and this he has not done. His claim must, therefore, be dismissed.

4.     **CONCLUSION**

Viewing the record evidence in the light most favorable to Patterson, there is insufficient evidence to raise triable issues of fact as to any of his claims. The record and the relevant authorities oblige the Court to dismiss this case in its entirety.[14]

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment (Docket #54) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's motion for appointment of counsel (Docket #81) be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion to strike Plaintiff's sur-reply in opposition to their motion for summary judgment (Docket #84) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants John and Jane Does 1–10 be and the same are hereby **DISMISSED** from this action; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

_____

[14]Patterson joined numerous Doe defendants in this action. *See* (Docket #1). The Court ordered him to use discovery to ascertain their identities. (Docket #9 at 4). The Court set a deadline of January 4, 2017, for him to do so and file an amended complaint identifying these individuals. (Docket #13 at 1). Patterson did not do so, nor did he ask for the Court's assistance in this endeavor. As a result, the Court will dismiss the Doe defendants. *See Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 556 (7th Cir. 1996).

Dated at Milwaukee, Wisconsin, this 31st day of July, 2017.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Court